UNITED STATES of America

v.

Sherman A. BERRY, Appellant.

UNITED STATES of America

v.

Rudolph E. SOMERS, Appellant.

UNITED STATES of America

v.

Shirley F. SPEARMAN, Appellant.

UNITED STATES of America

v.

Paul GRAY, Appellant.

UNITED STATES of America

v.

Bessie I. BERRY, Appellant.

Nos. 71-1135 and 71-1231 to 71-1234.

United States Court of Appeals, District of Columbia Circuit.

Argued March 13, 1972.

Decided June 1, 1972.

Mr. John A. Shorter, Jr., Washington, D. C., with whom Mr. William A. Borders, Washington, D. C., was on the brief, for appellants.

Mr. Robert S. Tignor, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry and James E. Sharp, Asst. U. S. Attys., and Donald T. Bucklin, Asst. U. S. Atty., at the time the brief was filed, were on the brief, for appellee. Mr. Harold H. Titus, Jr., present U. S. Atty., also entered an appearance for appellee.

Before LEVENTHAL and ROBB, Circuit Judges, and MATTHEWS,* U. S. Senior District Judge for the District of Columbia.

MATTHEWS, Senior District Judge:

In a prosecution under a multiple count indictment appellants were convicted of violating the gambling laws. Appellants Sherman A. Berry and Rudolph E. Somers were convicted of operating a lottery in violation of 22 D.C.Code § 1501. They were also convicted, along with appellants Paul Gray and Shirley F. Spearman, of maintaining gambling premises at 3416 Eads Street, N.E., Washington, D.C., in violation of 22 D.C. Code § 1505. Appellant Bessie L. Berry and all of the heretofore named appellants were convicted of possessing num-

* Sitting by designation pursuant to 28 U.S.C. § 294(c) (1970).

bers slips in violation of 22 D.C.Code § 1502. The appeals from these convictions have been consolidated.

Prior to trial appellants moved to suppress evidence seized from them on the ground that there was not probable cause for the issuance of the warrants and hence that the searches and seizures were unlawful. The motion was denied.

The sole issue on appeal is whether the district court erred in finding the affidavit in support of the search warrants sufficient to constitute probable cause for the searches and seizures.

Having received information that "Rudolph E. Somers was picking up numbers . . . and taking them to 3416-Eads Street N.E., which is the numbers office of Sherman A. Berry, who is a well known area gambler," two officers of the Metropolitan Police Gambling Squad initiated an investigation entailing daily surveillance of the address, 3416 Eads Street, Northeast, from Wednesday, October 15, through Wednesday, October 22, 1969, excluding the intervening weekend. On October 23, search warrants for the Eads Street address and for 721 46th Street, Southeast were obtained, the premises were entered, the defendants were arrested, and certain gambling paraphernalia were seized as physical evidence.

Appellants have challenged the validity of the search warrants on the ground that the affidavit in support of the warrants is lacking in the fundamental requirements enunciated in Aguilar v. Texas,[1] Spinelli v. United States,[2] and United States v. Long[3] in that (1) the affidavit failed to set forth factual circumstances from which a magistrate could appraise the informant's credibility; (2) the affidavit did not sufficiently state the underlying circumstances upon which the informant based his conclusion; and (3) the informant did not describe the accused's criminal activity in sufficient

detail to show the magistrate that he is relying on something more than rumor. Further, appellants contend that, viewed in the entirety, the affidavit falls short of the standards of probable cause enunciated by the Supreme Court in its decisions in this field.

Appellants have seized upon the first paragraph of the affidavit, which is reproduced in full in the Appendix to this opinion, which states:

"During the month of October 1969, information was received in the office of the Gambling Squad, Morals Division, Metropolitan Police Dept., that Rudolph E. Somers was picking up numbers in the District of Columbia and then taking them to 3416-Eads Street N.E., which is the numbers office of Sherman A. Berry, who is a well known area gambler. As a result of this information Plc. Matthew C. Rettew and Officer George A. Woo were assigned to conduct an investigation."

Finding nothing regarding the credibility of the informant, no statement of underlying circumstances upon which informant based his conclusions, and no description by informant of the accused's criminal activity in sufficient detail to show that he was relying on something more substantial than rumor, appellants contend that the affidavit, according to the teaching of *Aguilar, Spinelli* and *Long,* is fatally deficient.

In the *Aguilar* affidavit the informant's tip alone was intended to provide the basis for probable cause. In such a situation, the Supreme Court held it essential that the affiant state some of the underlying circumstances necessary to enable the magistrate independently to judge the validity of the informant's conclusion as well as the affiant's conclusion that the informant was "credible" or his information "reliable." The rationale here is that if the magistrate is not to become a "rubber stamp" for the

1. 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

2. 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

3. 142 U.S.App.D.C. 118, 439 F.2d 628 (1971).

police, he must have a basis for assessing the probabilities of truth as to a purely hearsay statement made by a person unknown to him.

That these requirements regarding an informant could be mitigated, depending upon other facts which might be included in the affidavit, such as corroboration of the tip by police investigation, is implicit in the Court's statement that

"If the fact and results of such a surveillance had been appropriately presented to the magistrate, this would, of course, present an entirely different case." 378 U.S. at 109, note 1, 84 S.Ct. at 1511.

The *Spinelli* affidavit relied upon an informant's tip, but it also included the results of an FBI surveillance in an effort to corroborate the tip, thus presenting the question as to how the *Aguilar* test was to be applied in such a situation.

Although United States v. Long, *supra*, had not been decided at the time the district court denied the motion to suppress, it lends no support to appellants' contentions. The *Long* affidavit relied on information from the "personal knowledge" of two confidential informants and an independent FBI surveillance report. Finding this situation quite similar to *Spinelli*, we followed its guidelines in deciding *Long*.

■ Clearly these decisions are grounded on affidavits where the basis for probable cause lies primarily on the informant's information. However, we find nothing in the aforesaid cases to support a conclusion that an independent police investigation could not make a sufficient showing of probable cause, even where the investigation began with a tip from an anonymous informant whose credibility, reliability and source of information were questionable or unknown. In DiPiazza v. United States,[4] the Sixth Circuit pointed out that

"*Spinelli* is no authority for the proposition that the search warrant is invalid because an investigation is begun as a result of a tip. Weak, anonymous and even untrustworthy information may serve as the opening clue to uncovering criminal acts."

We also agree with the District Judge who first considered appellants' argument on their motion to suppress and concluded "this is surely not the teaching of *Spinelli* and *Aguilar* for it would lead to absurd results in cases such as this."

■ The affidavit before us does not depend on the tip as the basis for probable cause. The impact of the first paragraph is that the "information received" triggered the investigation by Plc. Rettew and Officer Woo. These officers then set out in nine full paragraphs the details and results of their investigation. It is primarily from this data that probable cause will stand or fall.

We turn now to the affidavit, viewed in its entirety, to determine whether, as appellants contend, it falls short of the standards of probable cause enunciated by the Supreme Court in its decisions in this field.

In *Spinelli* the Supreme Court was face to face with the situation it had anticipated in *Aguilar* and how the so-called "two-pronged test of Aguilar" was to be applied. The affidavit showed that the FBI was relying on information received from a "confidential, reliable informant" that Spinelli was operating a handbook and accepting wagers and disseminating wagering information by means of the telephones whose numbers were WYdown 4-0029 and WYdown 4-0136. The affiant had offered no reason in support of his conclusion that the informant was credible, his information reliable, nor the underlying circumstances upon which informant had based his conclusions. So far as the tip was concerned, the affidavit failed the *Aguilar* test.

Focusing then on the FBI investigation, the FBI had kept track of Spinelli's movements for five days in August 1965. On four of the five days Spinelli crossed the river from Illinois to St. Louis between 11:00 and 12:00 noon; he parked

4. 415 F.2d 99, 105 (1969).

his car in a parking lot of a certain apartment house between 3:30 and 4:45 p. m.; on one day he was seen entering a particular apartment in that building. The telephone company verified two telephones assigned to that apartment— WYdown 4-0029 and WYdown 4-0136— listed under the name of Grace P. Hagen. The Court found this to be innocent-seeming activity and data, and emphasized that this information alone would not establish probable cause.

The Court then tested the informant's information against the FBI investigation. It refused to give any weight to an assertion in the affidavit that "Spinelli was 'known' to the affiant and to other federal and local law enforcement officers as a gambler and an associate of gamblers", dismissing this as a "bald and unilluminating assertion of suspicion." [5] In a 5–3 decision, the majority of the Court concluded that the "investigation" did not corroborate enough of the "tip" to meet the reliability test of *Aguilar*.

This decision brought forth one of Mr. Justice Black's most scathing dissents. Taking issue with the majority's refusal to give weight to Spinelli's reputation as a gambler he stated:

> "Although the statement is hearsay that might not be admissible in a regular trial, everyone knows, unless he shuts his eyes to the realities of life, that this is a relevant fact which, together with other circumstances, might indicate a factual probability that gambling is taking place." [6]

And, after pointing out the salient information contained in the affidavit, considered in its entirety, Mr. Justice Black concluded that

> "[t]he foregoing facts should be enough to constitute probable cause for anyone who does not believe that the only way to obtain a search warrant is to prove beyond a reasonable doubt that a defendant is guilty." [7]

The affidavit in *Long* asserted that two unnamed *confidential informants* had "personal knowledge" that Long was engaged in a numbers operation in Russ Cecchini's apartment. There were statements that these confidential informants were well acquainted with gambling activities in the Washington (D.C.) area and had furnished information on numerous occasions in the past that was either verified as correct through independent sources or FBI observations.

Following the edict of *Spinelli*, we found that this did not meet the *Aguilar* test. Even if there was no dispute as to informants' reliability, the affidavit failed to assert the "underlying circumstances" upon which the informants based their conclusions. It was our opinion that a mere statement that the information was based on the informants' "personal knowledge" was no more than a conclusion, insufficient for a magistrate to infer that the information was gained in a reliable way.

The affidavit contained a statement that Russ Cecchini, 2338 24th Street, S. E., Washington, D.C. had been convicted in 1968 on gambling and numbers charges. This was followed by the observations of the FBI of Long's movements in entering and leaving the Cecchini apartment, for nine days between August 15 and September 10, 1969.

The report showed that on five of these days Long left 5231 Devonshire Drive, Oxon Hill, Maryland (hereafter the "Maryland address") in his automobile between 10:00 and 11:00 a. m., and between 11:00 and 12:00 noon he parked car in front of 2338 24th Street, S.E. (hereafter the "Southeast Address"); on three of these days Long was seen entering the building numbered "2338"; on one day Long was seen entering apartment number "1604"; on two days Long left the Southeast address in his automobile around 7:00 p. m. and drove to the Maryland address; on two occasions it was averred that Long looked about, as if to see if he was being watched.

5.  393 U.S. at 414, 89 S.Ct. at 588.

6.  393 U.S. at 431, 89 S.Ct. at 596.

7.  *Id.*

While considerable detail was presented in the affidavit regarding the FBI's observations of Long's comings and goings, we found that the actions of Long observed and reported were entirely innocent ones which might be performed by any citizen going about his normal activities. As to the statement that Long looked about to see if he was being watched, we considered this conclusory and insufficient to support a probability that Long was engaged in some sort of illegal conduct.

There was no statement in the affidavit that Long had a prior criminal record nor that he was known to law enforcement officers as a gambler. Comparing the investigation with the tip, we could not find Long's entering and leaving the Cecchini apartment, without more, corroborated the conclusion that Long was engaged in a numbers operation.

Shortly after our decision in *Long*, the Supreme Court handed down United States v. Harris,[8] involving the sufficiency of an affidavit supporting a search warrant, the execution of which resulted in the discovery of illicit spirits. The affidavit stated, *inter alia,* that Harris had a reputation with the investigator for over four years as being a trafficker of nontaxpaid distilled spirits. The Sixth Circuit had found this affidavit inadequate, having relied on *Spinelli* in giving no weight to affiant's assertion concerning Harris' reputation. In a 5–4 opinion the Supreme Court reversed.

Acknowledging that in *Spinelli* it had rejected as entitled to no weight the "bald and unilluminating" assertion that the suspect was known to the affiant as a gambler, on the authority of Nathanson v. United States,[9] the Court said:

"But a careful examination of *Nathanson* shows that the *Spinelli* opinion did not fully reflect the critical points of what *Nathanson* held since it was limited to holding that reputation, *standing alone,* was insufficient; it surely did not hold it irrelevant when supported by other information. This reading of *Nathanson* is confirmed by Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), in which the Court, in sustaining a finding of probable cause for a warrantless arrest, held proper the assertion of the searching officer that he had previously arrested the defendant for a similar offense and that the defendant had a reputation for hauling liquor." [10]

In contrast to the different function of a criminal trial, the Court emphasized that *before* the trial we deal only with probabilities, which, in the words of Mr. Justice Rutledge, "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." [11] In applying these principles to *Harris,* the Chief Justice, writing for the majority, said:

"We cannot conclude that a policeman's knowledge of a suspect's reputation—something that policemen frequently know * * * —is not a 'practical consideration of everyday life' upon which an officer (or a magistrate) may properly rely in assessing the reliability of an informant's tip. To the extent that *Spinelli* prohibits the use of such probative information, it has no support in our prior cases, logic, or experience and we decline to apply it to preclude a magistrate from relying on a law enforcement officer's knowledge of a suspect's reputation." [12]

8.  403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

9.  290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933).

10.  403 U.S. at 582, 91 S.Ct. at 2081.

11.  Brinegar, *supra,* at 175, 69 S.Ct. at 1310.

12.  403 U.S. at 583, 91 S.Ct. at 2081. Mr. Justice Black, concurring in the decision, would go further and overrule *Aguilar* and *Spinelli* and "wipe their holdings from the books." 403 U.S. at 585, 91 S.Ct. at 2083. Mr. Justice Blackmun, concurring, would likewise overrule *Spinelli*, pointing out that he was a member of the 6–2 majority

With this background and the *Ventresca* [13] admonition that affidavits are "normally drafted by nonlawyers in the midst and haste of a criminal investigation," and they "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion," we turn to the affidavit at bar.

The magistrate had before him the sworn statement of the two officers who conducted a six-day investigation, that Rudolph E. Somers, convicted the preceding year for possession of number slips and maintaining gambling premises, regularly entered the premises of 3416 Eads Street, Northeast, between 2:20 and 2:30 p. m. carrying a small package; that on four of these days Sherman Berry, three-times arrested for gambling offenses and once convicted for possession of numbers slips, entered the premises of 3416 Eads Street, Northeast, between 6:10 and 6:30 p. m. and departed between 7:00 and 7:10 p. m.; that Somers regularly left the Eads Street premises between 7:35 and 7:50 p. m. carrying a small package, which he delivered to 721 46th Street, Southeast, which premises were the subject of a raid in May of 1963 from which a large quantity of gambling paraphernalia had been seized and which resulted in the aforesaid arrest and conviction of Sherman Berry for possession of numbers slips.

The report in the affidavit of the investigation involves no element of "hearsay." This is not a case of arrest or search either on the say-so of "faceless informers" or with significant reliance on their assertions. The observations of the officers in their sworn affidavit form a reliable basis for a warrant applied for by them.[14]

We find a good deal more here to refute a conclusion of "innocent acts that might be performed by any citizen going about his normal activities."[15] The magistrate was told that Berry and Somers had *prior convictions* of violation of the gambling laws—an element totally absent in *Long,* and, we think, even stronger than the "known reputation", struck down in *Spinelli,* but resurrected in *Harris.* We have the additional fact of a "small package" being delivered to 3416 Eads early in the afternoon, which becomes significant when a like "small package" is being delivered in the early evening to premises which have been established by *police record* to have recently housed a gambling operation, and directly connected with the arrest and conviction of Berry, one of the subjects of the present investigation.

The clincher, of course, would be the officers' own knowledge that the "small package" being delivered by Somers contained *numbers slips.* As Mr. Justice Black dryly pointed out in his dissenting opinion in *Spinelli,* "[o]f course it would strengthen the probable-cause presentation if eyewitnesses could testify that they saw the defendant commit the crime * * * [but] [n]othing in our Constitution * * * requires that the facts be established with that degree of certainty and with such elaborate specificity before a policeman can be authorized by a disinterested magistrate to conduct a carefully limited search." [16]

■ We think the magistrate could reasonably infer from the facts presented that there was probable cause to believe the "small packages" contained numbers slips. The affidavit contained the uncorroborated information that Somers was delivering "numbers." However, as the *Harris* Court pointed out

"It will not do to say that warrants may not issue on uncorroborated hear-

of the Eighth Circuit opinion in *Spinelli,* which this Court by a 5–3 vote reversed, and he continues to feel that *Spinelli* at this level was wrongly decided. 403 U.S. at 585–586, 91 S. Ct. 2075.

13. United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

14. *Id.* at 111, 85 S.Ct. 741.

15. United States v. Long, 142 U.S.App. D.C. 118, 120, 439 F.2d 628, 630 (1971).

16. 393 U.S. at 429, 89 S.Ct. at 595.

say. This only avoids the issue of whether there is reason for crediting the out-of-court statement." [17]

The affidavit also contained direct information that Somers was seen by the two investigators delivering "small packages." The investigation not only verified the tip in substance, but revealed considerably more facts giving rise to the probability that Somers and Berry were involved in illegal conduct in the premises named in the affidavit. It was the belief of these two trained and experienced officers, based upon their knowledge as to how the "numbers game" lottery operation is conducted, the methods employed by persons engaged in such an operation, the time of day such activity is usually carried on, that the "small packages" which they saw Somers delivering contained numbers slips and related records used in the operation of the lottery. It would have been helpful if the investigating officers in their affidavit had elaborated on the *modus operandi* of the numbers operation, in particular regarding the significance of the time of day they observed Somers and Berry arriving and departing the Eads Street address.[18] If the nature and physical characteristics of the "small packages" were such as to be typical of those used in gambling operations, though innocent in outward appearance, that fact should have been stated. But we must take into account that a magistrate, experienced in these matters, is entitled to draw inferences from acts which to the uninitiated and unskilled would be seemingly innocent acts.[19] "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." [20]

We find the affidavit before us to be sufficient. The judgments of the district court are

Affirmed.

### APPENDIX TO OPINION OF THE COURT AFFIDAVIT IN SUPPORT OF WARRANT

Affidavit supporting the request for United States Magistrates Search and Arrest Warrants for the below described premises and persons for violations of the Lottery Laws of the District of Columbia.

SEARCH WARRANT: 3416—Eads Street N. E., Washington, D. C. (entire premises). Listed according to the 1969 City Directory as being occupied by Dewey Dennison.

721—46th Street S. E., Washington, D. C. (entire premises). Not Listed in the 1969 City Directory or Cross Directory.

ARREST WARRANT: Sherman Alexander BERRY, Negro, male, 58 years.

Rudolph Emory SOMERS, Negro, male, 48 years.

17. United States v. Harris, 403 U.S. 573, 584, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971).

18. At the trial Plc. Rettew explained that since the race which determined the "first" number went off at 3:00 p. m., it was necessary that runners, writers and other employees have their work in the office of operation between 2:15 and 2:45 p. m.—hence, the significance of Somers' arrival at the Eads Street address at approximately 2:20 p. m. each day. Somers' departure between 7:35 and 7:50 p. m. was the approximate time the "numbers operations" would be through for the day.

Berry's arrival time coincided with the time that the last number would come out. Rettew also believed it significant that Berry always arrived just as it was getting dark. He said that it is common knowledge among the people in the "numbers operations" that probable cause search warrants cannot be executed after dark.

19. Irby v. United States, 114 U.S.App. D.C. 246, 314 F.2d 251, cert. denied, 374 U.S. 842, 83 S.Ct. 1900, 10 L.Ed.2d 1064 (1963).

20. United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

STATEMENT OF FACTS:

During the month of October 1969, information was received in the office of the Gambling Squad, Morals Division, Metropolitan Police Dept., that Rudolph E. Somers was picking up numbers in the District of Columbia and then taking them to 3416—Eads Street N.E., which is the numbers office of Sherman A. Berry, who is a well known area gambler. As a result of this information Plc. Matthew C. Rettew and Officer George A. Woo were assigned to conduct an investigation.

About 2:30 PM, Wednesday, October 15, 1969, Plc. Matthew C. Rettew and Officer George A. Woo were in the vicinity of 3416 Eads Street N.E. Washington, D.C. and observed Rudolph E. Somers drive up and park a Cadillac, bearing D.C. Tags 553-450 in the 3400 block of Eads Street N.E., get out carrying a small package in his hand, and then walk to and enter the front door of 3416—Eads Street N.E., Washington, D.C. About 7:00 PM, the same date, the Officers were again in the vicinity of 3416 Eads Street N.E. and observed Rudolph Somers depart the front door of this premises, carrying a small package in his hand, get into the Cadillac 553-450 and drive out of the area. The Officers followed the Cadillac to the 700 block of 46th Street S.E. where Somers parked the auto, got out carrying the small package in his hand and then walk to and enter premises 721—46th Street S.E., Washington, D.C. carrying the package in his hand. About 7:35 PM, the same date, the Officers observed Rudolph Somers depart 721—46th Street S.E., minus the small package he had been carrying previously, get into the Cadillac 553-450 and drive out of the area. The Officers then departed the area.

Investigation reveals that Rudolph E. Somers was arrested on February 21, 1968 on charges of Operating a Lottery, Maintaining a Gambling Premises and Possession of Numbers Slips, was convicted of Maintaining a Gambling Premises and Possession of Numbers Slips

and was sentenced to $100.00 or 30 days on each of these charges. Investigation further reveals that D.C. tags are listed on a 1966 Cadillac to Jessie N. Dixon at 3155—19th Street N.W.

About 2:25 PM, Thursday, October 16, 1969, Plc. Matthew C. Rettew and Officer George A. Woo were in the vicinity of the 3400 block of Eads Street N.E. and observed Rudolph E. Somers drive up and park the Cadillac 553-450 get out carrying a small package in his hand and then walk to and enter the front door of 3416—Eads Street N.E., Washington, D.C. about 7:05 PM, the same date, the Officers observed Rudolph E. Somers depart 3416—Eads Street N.E., Washington D.C. carrying a small package in his hand, get into the Cadillac 553-450 and drive out of the area. The Officers followed the Cadillac to the 700 block of 46th Street S.E., where Somers parked the auto, got out carrying the small package in his hand, walked to 721—46th Street S.E., Washington, D.C. and entered the front door at 7:15 PM. About 7:40 PM, the same date, the Officers observed Rudolph Somers depart 721—46th Street S.E., Washington, D.C., minus the package he had been carrying previously, get into the Cadillac 553-450 and drive out of the area. The Officers then departed the area.

About 2:30 PM, Friday, October 17, 1969, Plc. Matthew C. Rettew and Officer George A. Woo were in the vicinity of the 3400 block of Eads Street N.E. and observed Rudolph E. Somers drive up and park the Cadillac 553-450 get out carrying a small package in his hand, walk to and enter the front door of 3416—Eads Street N.E., Washington, D.C. About 6:30 PM, the same date, the Officers observed Sherman A. Berry drive up and park a Cadillac, bearing D.C. tags 573-078, in the 3400 block of Eads Street N.E., and then walk to and enter the front door of 3416—Eads Street N.E., Washington, D.C. About 7:05 PM, the same date, the Officers observed Sherman A. Berry depart the front door of 3416—Eads Street N.E., get into the Cadillac 573-078 and drive out of the

area. About 7:10 PM, the same date, the Officers observed Rudolph Somers depart the front door of 3416—Eads Street N. E., carrying a small package in his hand, get into the Cadillac 553–450 and drive out of the area. The officers followed the auto to the 700 block of 46th Street S.E. where Somers parked the auto and then walked to and entered the front door of 721—46th St. S.E. carrying the small package in his hand. About 7:40 PM, the same date, the Officers observed Rudolph Somers depart 721—46th St. S.E., Washington, D.C., minus the small package that he had been carrying previously, get into the Cadillac 553–450 and drive out of the area. The Officers then departed the area.

Investigation reveals that Sherman A. Berry was arrested on 1–2–55 on charges of Operating a Lottery, was again arrested on 7–2–58 on charges of Operating a Lottery, was again arrested on 5–31–63 on charges of Operating a Lottery and Possession of Numbers Slips, was convicted on the charge of Possession of Numbers Slips and was sentenced to 1 year suspended and was placed on 2 years probation. Further investigation reveals that premises 721—46th Street S.E. was raided for Lottery violations on May 31, 1963 and a large quantity of numbers slips, an adding machine and other related gambling paraphernalia was seized from the premises. Arrested in this case was Sherman A. Berry and Bessie I. Berry of this address.

About 2:30 PM, Monday, October 20, 1969, Plc. Matthew C. Rettew was in the vicinity of the 3400 block of Eads Street N.E. and observed Rudolph Somers drive up and park the Cadillac 553–450, and then walk to and enter the rear door of premises 3416—Eads Street N.E., Washington, D.C. carrying a small package in his hand. About 6:35 PM, the same date, the Officer observed Sherman A. Berry drive up and park the Cadillac 573–078 in the 3400 block of Eads Street N.E. and then walk to and enter the front door of 3416—Eads Street N.E. About 7:00 PM, the same date, the Officer observed Sherman A. Berry depart 3416—

Eads Street N.E., get into the Cadillac 573–078 and drive out of the area. About 7:20 PM, the same date, the Officer observed Rudolph Somers depart premises 3416—Eads Street N.E. carrying a small package in his hand, get into the Cadillac 553–450 and drive out of the area. The Officer followed the Auto to the 700 block of 46th Street S.E., where he parked the auto, and then walked to and entered the front door of 721—46th Street S.E. carrying the small package in his hand. About 7:50 PM, the same date, the Officer observed Rudolph Somers depart 721—46th St. S.E., minus the package he had been carrying previously, get into the Cadillac 553–450 and drive out of the area. The Officer then departed the area.

Investigation reveals that D.C. tags are listed to Bessie I. Berry at 721—46th Street S.E., Washington, D.C. on a 1967 Cadillac.

About 2:20 PM, Tuesday, October 21, 1969, Plc. Matthew C. Rettew and Officer George A. Woo were in the vicinity of the 3400 block of Eads St. N.E. and observed Rudolph Somers drive up and park the Cadillac 553–450, and then walk to and enter the front door of 3416 Eads Street N.E. About 6:30 PM, the same, date, the Officers observed Sherman A. Berry drive up and park the Cadillac 573–078 in the 3400 block of Eads Street N.E. and then walk to and enter the front door of 3416 Eads Street N.E. About 7:00 PM, the same date, the Officers observed Sherman A. Berry depart 3416 Eads St. N.E., get into the Cadillac 573–078 and drive out of the area. About 7:05 PM, the same date, the Officers observed Rudolph Somers depart 3416 Eads Street N.E. carrying a small package in his hand, get into the Cadillac 553–450 and drive out of the area. The Officers followed the auto to the 700 block of 46th St. S.E. where Somers parked and then entered premises 721—46th St. S.E., carrying a small package in his hand. About 7:40 PM, Somers departed 721—46th St. S.E., minus the small package, got into the Cad. 553–450 and drove out of the area.

About 2:30 PM, Wednesday, October 22, 1969, Plc. Matthew C. Rettew and Officer George A. Woo were in the vicinity of the 3400 block of Eads and observed Rudolph Somers drive up and park the Cadillac 553–450, get out and then walk to and enter the front door of 3416—Eads Street N.E. carrying a small package in his hand. About 6:10 PM, the same date, the Officers observed Sherman A. Berry drive up and park the Cadillac 573–078 in the 3400 block of Eads Street N.E., and then walk to and enter the front door of 3416 Eads Street N.E. About 7:10 PM, the same date, the Officers observed Sherman A. Berry depart the front door of 3416—Eads Street N.E., get into the Cadillac 573–078 and drive out of the area. About 7:15 PM, the same date, the Officers observed Rudolph Somers depart the front door of 3416—Eads Street N.E., carrying a small package in his hand, get into the Cadillac 553–450 and drive out of the area. The Officers followed the auto to the 700 block of 46th St. S.E. where Somers parked the auto and then walked to and entered the front door of 721—46th Street S.E. carrying the small package in his hand. About 7:45 PM, the same date, the Officers observed Rudolph Somers depart 721—46th St. S.E., minus the small package that he had been carrying previously and then get into the Cadillac 553–450 and drive out of the area. The Officers then departed the area.

Based upon the information received, the observations made by the undersigned Officers, the knowledge of the investigating Officers as to how the "numbers game" Lottery Operation is conducted, the methods employed by persons engaged in such an operation, the time of day such activity is usually carried on, it is the firm belief of the undersigned Officers that the persons named herein are actively engaged in the operation of a Lottery. Further, that where small packages are mentioned, that they contained numbers slips and related records used, or to be used in the operation of this lottery and that premises' 3416—Eads Street N.E. and 721—46th Street S.E., both in Washington, D.C. are now being used as a numbers counting house or office for the purpose of processing the bet slips and handling the accounting procedures, and that there is now concealed in these premises, numbers slips and records and related gambling paraphernalia, used in the operation of this lottery, all of which is contrary to and in violation of the Lottery Laws of the District of Columbia.

/s/ Matthew C. Rettew
    MATTHEW C. RETTEW
    PLC.        MPDC
GAM GAMBLING SQUAD

/s/ George A. Woo
    GEORGE A. WOO
    OFF.        MPDC
    GAMBLING SQUAD

SUBSCRIBED AND SWORN TO BEFORE ME THIS 23rd DAY OF OCTOBER 1969.

/s/ John F. Doyle
UNITED STATES COMMISSIONER FOR THE DISTRICT OF COLUMBIA.